Slip Op. 11-113

UNITED STATES COURT OF INTERNATIONAL TRADE

```
                                    :
TOYOTA MOTOR SALES, U.S.A., INC.:
                                    :
              Plaintiff,            :
                                    : Before: Richard K. Eaton, Judge
        v.                          :
                                    : Court No. 04-00643
UNITED STATES,                      :
                                    :
              Defendant,            :
                                    :
                                    :
```

OPINION and JUDGMENT

[Plaintiff's motion for summary judgment denied.  Defendant's motion for summary judgment granted.]

Dated: September 8, 2011

*Page Fura, P.C.* (*Jeremy Page* and *Shannon Fura*), for plaintiff Toyota Motor Sales, U.S.A., Inc.

*Tony West*, Assistant Attorney General; *Barbara S. Williams*, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Saul Davis*); Office of Assistant Chief Counsel, International Trade Litigation, United States Customs and Border Protection (*Yelena Slepak*), of counsel, for defendant.

Eaton, Judge: Plaintiff Toyota Motor Sales, U.S.A., Inc.

("Toyota" or "plaintiff") commenced this action to challenge

Customs and Border Protection's ("Customs" or "CBP") denial of

Toyota's claims for duty drawbacks on entries of automobile

service parts imported into the United States and later exported

to Canada.[1]  Now before the court are Toyota's and defendant the

---

[1]    According to plaintiff, these imports involve "certain automotive service parts for distribution to Plaintiff's

United States' cross-motions for summary judgment pursuant to

USCIT R. 56.  The court has jurisdiction under 28 U.S.C.

§ 1581(a) (2006).  For the reasons stated below, Toyota's motion

is denied, and defendant's motion is granted.


                            BACKGROUND

     Toyota is the U.S. based sales and service arm of the Toyota

Motor Corporation.  The company regularly imports service parts

into the United States, and subsequently exports some of these

parts to Canada for distribution to Canadian Toyota dealerships

and customers.  Toyota, therefore, routinely files drawback

claims, seeking reimbursement of a substantial portion of the

duties paid upon importation.

     Plaintiff commenced this action to challenge Customs' denial

of Protest No. 2704-03-100090 (the "Protest"), which sought

reversal of Customs' denial of its drawback claims on forty-two

entries of service parts exported from the United States to

Canada between 1996 and 1999.  At issue is Toyota's compliance

with Customs' regulation 19 C.F.R. § 191.14 (2011), which governs

the use of inventory accounting methods to identify drawback

eligible merchandise, and Customs regulations 19 C.F.R. §§ 191.51

---

wholesale distributors and franchised dealers.  The service parts
are varied in nature, and include such items as hoses, gaskets,
gears and gearing, fasteners, brackets, body stampings, mirrors,
moldings, valves, pipes, filters, belts, injectors, and other
vehicle-related assemblies."  Compl. ¶ 37.

and 191.52, which govern the time for filing and amending

drawback claims. *See* Compl. ¶¶ 38-60.


I.  Drawback Under NAFTA

Under 19 U.S.C. § 1313(j)(1),[2] an importer can receive a

refund of ninety-nine percent of the amount of the duty, tax, or

fee paid on unused merchandise imported into the United States,

if the merchandise is exported within three years from the date

of importation.  Because Toyota's drawback claims concern unused

merchandise exported to Canada, its claims arise under 19 U.S.C.

§ 1313(j)(4), which governs drawbacks for merchandise exported

from the United States to its co-signatory countries under the

North American Free Trade Agreement ("NAFTA Drawbacks").  NAFTA

---

[2]     Pursuant to 19 U.S.C. § 1313(j)(1):

If imported merchandise, on which was paid any duty,
tax, or fee imposed under Federal law upon entry or
importation –

   (A) is, before the close of the 3-year period
   beginning on the date of importation –

        (I) exported, or

        (ii) destroyed under customs supervision; and

   (B) is not used within the United States before
   such exportation or destruction;

then upon such exportation or destruction 99 percent of the
amount of each duty, tax, or fee so paid shall be refunded
as drawback.  The exporter (or destroyer) has the right to
claim drawback under this paragraph, but may endorse such
right to the importer or any intermediate party.

Drawbacks are generally prohibited, unless the exported

merchandise qualifies for an exception under 19 U.S.C. §

3333(a)(1)-(8).  The parties do not dispute that the service

parts could qualify for NAFTA Drawback under Section 3333(a)(2),[3]

which permits drawbacks on goods that were "exported to a NAFTA

country in the same condition as when imported into the United

States."

    Because § 1313(j)(4) prohibits so-called substitution

---

[3]     19 U.S.C. § 3333(a) provides:

"Good Subject to NAFTA drawback" defined.  For
purposes of this Act and the amendments made by
subsection (b), the term "good subject to NAFTA
drawback" means any imported good other than
the following:

*** 

(2)  A good exported to a NAFTA country in the
same condition as when imported into the
United States.  For purposes of this paragraph
--

    (A) processes such as testing, cleaning,
repacking, or inspecting a good, or preserving
it in its same condition, shall not be
considered to change the condition of the
good, and

    (B)  . . . if a good described in the first
sentence of this paragraph is commingled with
fungible goods and exported in the same condition,
the origin of the good may be determined on the
basis of the inventory methods provided for in the
regulations implementing this title.

drawbacks[4] for exports to NAFTA countries, reimbursement may only

be claimed if the merchandise itself is actually (1) imported,

(2) dutiable, and (3) subsequently exported.  See *Merck & Co.,*

*Inc. v. United States*, 499 F.3d 1348, 1357 (Fed. Cir. 2007).

Pursuant to § 3333(a)(2)(B), a drawback claimant may,

however, identify drawback eligible merchandise using inventory

accounting methods, as set forth by regulation, to establish that

the merchandise has been imported into the United States, that

duties were paid thereon, and that it was exported within the

time limits for drawbacks provided for in § 1313(j)(1).  In other

words, in submitting claims for NAFTA Drawback, a claimant need

not track merchandise on a unit-specific basis if it can identify

those exports eligible for drawback through an approved

accounting method.

II.  The Use of Inventory Accounting Methods to Identify Drawback
Eligible Merchandise

Section 3333(a)(2)(B) provides that, for imported goods that

are "commingled with fungible goods[5] and exported in the same

_____

[4]      Substitution drawbacks are generally permitted by 19
U.S.C. § 1313(j)(2), which provides that a drawback is permitted
on exported merchandise for which no duty has been paid if such
merchandise is "commercially interchangeable" with other
merchandise that the party claiming drawback has paid duties on.

[5]      While Toyota now concedes that all of its service parts
do not constitute a fungible whole, it continues to believe that
it can take advantage of 19 C.F.R. § 191.14 because individual
parts are fungible with each other.

condition, the origin of the good may be determined on the basis

of the inventory methods provided for in the regulations

implementing this title."  Pursuant to this statutory authority,

Customs promulgated 19 C.F.R. § 191.14 to "provide[] for the

identification of merchandise or articles for drawback purposes

by the use of accounting methods."  *See* 19 C.F.R. § 191.14(a).[6]

In accordance with § 191.14(a), if an importer maintains

fungible inventories consisting of both drawback eligible and

ineligible merchandise (e.g., domestically produced products),

any merchandise subject to drawback may be identified by

inventory accounting methods.  Using these methods, a drawback

claimant may establish that, based on its inventory records,

dutiable merchandise must have been exported within three years

of importation, as required by § 1313(j)(1).  Because Toyota

commingled imported service parts on which it paid import duties

and subsequently exported to Canada unused ("drawback eligible

merchandise") with other service parts for which no drawback was

available (*e.g.*, domestically produced service parts or duty-free

service parts), it sought to identify its drawback eligible

merchandise using the inventory accounting methods set forth in

§ 191.14(c).  It is Toyota's compliance with § 191.14 that is a

--------

[6]     The regulation specifically states that its provisions
apply only "to situations . . . in which substitution is not
allowed."  19 C.F.R. § 191.14(a).  As noted, 19 U.S.C. §
1313(j)(4) prohibits substitution drawbacks for exports to NAFTA
countries.

significant issue in this action.


III.   The Low-to-High Accounting Method

One of the permitted accounting methods for identifying

drawback eligible merchandise under § 191.14(c) is the low-to-

high method.   Toyota's claims raise issues with respect to two

variations of the low-to-high method, as set forth in § 191.14(c)

– first, the low-to-high blanket method (the "Blanket Method");

and second, the low-to-high method with established inventory

turn-over period (the "Inventory Turnover Method").   In general,

the low-to-high method attributes the lowest available drawback

amount to merchandise withdrawn from the inventory during a

specified period of time.   Like the other accounting methods set

forth in § 191.14(c), this method can only be applied to an

inventory of fungible merchandise.   *See* 19 C.F.R. § 191.14(b)(1)

("The lots of merchandise or articles to be so identified must be

fungible. . . ."").   A fungible inventory is one that consists

solely of commercially interchangeable merchandise.   *See* 19

C.F.R. § 191.2(o).[7]   Thus, any variation of the low-to-high method

---

[7]      The Federal Circuit has explained that "commercial
interchangeability" is determined by a "market-based
consideration of the primary purposes of the goods in question. .
. . [and] must be determined objectively from the perspective of
a hypothetical reasonable competitor; if a reasonable competitor
would accept either the imported or the exported good for its
primary commercial purpose, then the goods are "commercially
interchangeable' . . . ."   *See Texport Oil Co. v. United States*,
185 F.3d 1291, 1295 (Fed. Cir. 1999) (citations omitted).

may only be applied when an importer has commingled fungible

drawback eligible and ineligible merchandise in a single

inventory.

When applying the Blanket Method variation of the low-to-

high method:

> all receipts into and all withdrawals for export are
> recorded in the accounting record and accounted for so
> that each withdrawal is identified by recordkeeping on
> the basis of the lowest drawback amount per available
> unit of the merchandise or articles received into
> inventory in the period preceding the withdrawal equal
> to the statutory period for export under the kind of
> drawback involved (e.g., . . . 3 years under 19 U.S.C.
> § 1313(j) . . .).  Drawback requirements are applicable
> to withdrawn merchandise or articles as identified (for
> example, if the merchandise or articles identified were
> attributable to an import more than . . . 3 years . . .
> before the claimed export, no drawback could be
> granted).

19 C.F.R. § 191.14(c)(iv)(A).  Thus, under the Blanket Method,

the low-to-high procedures are applied during the three year

period preceding the drawback claim, which is equal to the

statutory limitation period for drawback claims on unused

merchandise.  Because all of the merchandise identified through

the use of accounting must also comply with the basic drawback

requirements, the accounting is only applied to merchandise that

is imported and exported during that three year period.

The Inventory Turnover Method variation of the low-to-high

method is applied to commingled, fungible inventory over a period

equal to the average turnover of the entire inventory.  For

example, if, on average, the entire inventory of a particular

product were depleted every thirty days, the low-to-high method
would be applied to units of that product taken into and
withdrawn from inventory during a thirty day period.  *See* 19
C.F.R. § 191.14(c)(3)(iii)(D).  By applying this method to every
thirty day period over the course of three years, a drawback
claimant could demonstrate that all of the drawback eligible
merchandise was both imported and exported within that period of
time.

IV.   Toyota's Drawback Claims

For some years, Toyota sought and received drawback using
the Blanket Method.  Beginning in April 1999, however, the
company pursued a new accounting method[8] - *i.e.*, the Inventory
Turnover Method - to identify its drawback eligible merchandise,
pursuant to § 191.14(c)(3)(iii).  Pl.'s Rule 56.1 Statement ¶¶6-
7; Def.'s Resp. to Pl.'s Rule 56.1 Statement ¶¶6-7.  According to
Toyota, it switched from the Blanket Method to the Inventory
Turnover Method because the latter would "serv[e] to meet the
system considerations and constraints" of the company's outside
drawback specialist.  *See* Protest at 2.

On April 5, 1999, Toyota filed an application with Customs

_____

[8]     On March 5, 1998, part 191 of the Customs regulations
was amended to include the Low-to-High Method with Established
Inventory Turnover Period as among the acceptable inventory
accounting methods for identifying drawback eligible merchandise.
63 Fed. Reg. 10,970, 11,013 (Dep't of Treasury March 5, 1998).

for a Waiver of Prior Notice of Intent to Export[9] and for the

privilege of Accelerated Payment[10] for drawback claims based on

its use of the Inventory Turnover Method for the forty-two

entries at issue here.  Customs granted Toyota's application on

June 11, 1999.  The effect of Customs' approval was to permit

Toyota to claim drawbacks on exports without first affording

Customs an opportunity to inspect it.  Accelerated Payment meant

that Toyota would be able to receive payment of drawback amounts

sought, even though Customs had yet to verify its compliance with

applicable statutory and regulatory requirements.  Def.'s Rule

56.1 Statement ¶¶8-9; Pl.'s Resp. to Def.'s Rule 56.1 Statement

¶¶8-9.

In its application, Toyota proposed to use a "days of

---

[9]     Pursuant to 19 C.F.R. § 191.35, a party seeking to
export merchandise that will be the subject of a drawback claim
must provide Customs with notice of the intent to export, and an
opportunity to inspect the merchandise prior to export.  Under 19
C.F.R. § 191.91, however, a party may submit an application to
Customs for a waiver of this notice requirement.  After waiver of
the notice requirement has been granted, "Customs may propose to
revoke the approval of an application for waiver of prior notice
of intent to export . . . for good cause (noncompliance with the
drawback law and/or regulations)."  19 C.F.R. § 191.91(e).

[10]     Pursuant to 19 C.F.R. § 191.92, a party seeking
drawback may apply for accelerated payment, which allows it to
receive, upon the filing of its drawback claims, the amount
sought prior to Customs' verification of its drawback claims.
While this expedites payment of drawbacks to the applicant,
"[a]ccelerated payment of a drawback claim does not constitute
liquidation of the drawback entry."  19 C.F.R. § 191.92(a).
Accordingly, if Customs determines that the applicant was not
entitled to drawback, accelerated payment amounts must be
refunded to Customs.

supply" method[11] for calculating an inventory turnover period of

forty-eight days to be used in applying the Inventory Turnover

Method to its inventory records.  In granting Toyota's

application for Waiver of Prior Notice and Accelerated Payment,

Customs stated that "[i]n approving this request, the U.S.

Customs Service expresses no opinion as to the entitlement of

drawback and makes no assurances, rulings, or decisions that may

be relied upon to anyone's detriment."  Def.'s Rule 56.1

Statement ¶2; Pl.'s Resp. to Def.'s Rule 56.1 Statement ¶2.

    On August 27, 1999, Toyota confirmed to Customs its

intention to withdraw its earlier claims under the previously

used Blanket Method for merchandise imported after October 1996,

and its intention to resubmit its drawback claims, using the

Inventory Turnover Method.  Pl.'s Rule 56.1 Statement ¶11; Def.'s

Resp. to Pl.'s Rule 56.1 Statement ¶11.

    Around September of 1999, a Customs drawback specialist

contacted Toyota to request additional information regarding

Toyota's average inventory turnover period.  In addition, the

---

[11]    According to the affidavit testimony of Toyota's former
Customs Manager, the "days of supply" method was a calculation
"which reflected the average number of days required for the
service parts inventory maintained by [Toyota] to undergo an
inventory turn."  Under this method, "it computed the inventory
turn-over period based on *all service parts found in inventory*"
because Toyota "considered all such service parts to be one type
of merchandise for drawback identification, tracking and claim
purposes."  *See* Declaration of Marian Duntley ¶9, attached as Ex.
1 to Pl.'s Mot. S.J. (emphasis added).

specialist told Toyota that Customs was unsure whether Toyota's

accounting using the Inventory Turnover Method complied with the

regulations.  Beck Dep. 19:14-20:14 (July 21, 2009).  On October

15, 1999, Toyota submitted a memorandum to Customs offering

further explanation for why it believed that its proposed "days

of supply" calculation of the average inventory turnover period

met the requirements of § 191.14(c)(3)(iii)(C).[12]  Pl.'s Rule 56.1

Statement ¶13; Def.'s Resp. to Pl.'s Rule 56.1 Statement ¶13.

On November 23, 1999, Customs' Drawback Office filed a

request for internal advic[13] with Customs' Office of Regulations

---

[12]     19 C.F.R. § 191.14(c)(3)(iii)(C) provides:

*Establishment of inventory turn-over period.* For
purposes of this section, average inventory turn-over
period is based on the rate of withdrawal from
inventory and represents the time in which all of the
merchandise or articles in the inventory at a given
time must have been withdrawn. To establish an average
of this time, at least 1 year, or three (3) turn-over
periods (if inventory turns over less than 3 times per
year), must be averaged. The inventory turn-over period
must be that for the merchandise or articles to be
identified, except that if the person using the method
has more than one kind of merchandise or articles with
different inventory turn-over periods, the longest
average turn-over period established under this section
may be used (instead of using a different inventory
turn-over period for each kind of merchandise or
article).


[13]     Pursuant to 19 C.F.R. § 177.11(a), "[a]dvice or
guidance as to the interpretation or proper application of the
Customs and related laws with respect to a specific Customs
transaction may be requested by Customs Service field offices
from the Headquarters Office at any time, whether the transaction

and Rulings ("OR&R") "to confirm the validity of the accounting

methodology used by Toyota to identify its imported merchandise

for drawback."  Letter from Customs (R. Andrejko) to Toyota (M.

Duntley) (July 25, 2000) ("July 25, 2000 Letter"), attached as

Ex. 6 to Pl.'s Mot. S. J. ("Pl.'s Mot.").

In addition to the October 15, 1999 memorandum, on January

5, 2000, Toyota provided Customs with additional information

concerning its proposed inventory turnover period calculation.

Pl.'s Rule 56.1 Statement ¶14; Def.'s Resp. to Pl.'s Rule 56.1

Statement ¶14.  On July 25, 2000, Customs informed Toyota that

"we have yet to receive a response from the [OR&R] on our

internal advice request [of] November 23, 1999 concerning"

Toyota's use of the Inventory Turnover Method.  In the letter,

Customs admonished Toyota that due to OR&R's "heavy workload . .

. it may be some time before we receive a response to our

request" and "[w]hile it is certainly possible that a favorable

ruling may be issued, we would like to caution you that an

adverse ruling by our Headquarters could affect Toyota's drawback

eligibility for your claims currently on file."  July 25, 2000

Letter.  According to Toyota, this was the first time it was

---

is prospective, current, or completed. . . . Advice or guidance
will be furnished by the Headquarters Office as a means of
assisting Customs personnel in the orderly processing of Customs
transactions under consideration by them and to insure the
consistent application of the Customs and related laws in the
several Customs districts."

informed that Customs' drawback office had made a request for
internal advice.

In accordance with the statute, Toyota had three years from
the date of exportation in order to file a completed drawback
claim for its exports. Thus, as of July 25, 2000, time remained
for Toyota to amend its drawback claims for, at least, some of
the entries - *i.e.*, those exported after July 25, 1997. From
August 1999 and January 2000 there were numerous interactions
between representatives of Customs and Toyota concerning Toyota's
proposed inventory turnover period calculation, but

> at no time did [Customs] indicate that [Toyota's]
> selected "days of supply" approach for establishing
> inventory turn-over was improper or otherwise not in
> accordance with all applicable legal and regulatory
> requirements. Nor, for that matter, was any suggestion
> or recommendation made to [Toyota] to cease use of this
> approach. In fact, on several occasions, the Drawback
> Office stated to [Toyota] that [Toyota's] method was
> "probably okay."

Declaration of Marian Duntley ("Duntley Decl.") at ¶ 12, attached
as Ex. 1 to Pl.'s Mot. S.J.

On August 30, 2001, Customs notified Toyota of its intention
to revoke the company's drawback privileges because insufficient
information had been provided to enable OR&R to rule on the
request for internal advice. *See* Letter from Customs (R.
Andrejko) to Toyota (M. Duntley), dated August 30, 2001, attached
as Ex. 8 to Pl.'s S.J. Mot. (the "August 30 Letter").
Specifically, Customs informed Toyota that

> [w]e have received a response . . . from [OR&R] to our
> . . . November 23, 1999 inquiry as to whether or not
> the accounting methodology used by [Toyota] satisfies
> the [Inventory Turnover Methodology] requirements of 19
> C.F.R. § 191.14(c)(3)(iii)(c). OR&R believes that the
> days-of-supply method, as described by [Toyota], does
> not meet the [Inventory Turnover Method]. OR&R,
> however, did not make a formal ruling because [Toyota]
> failed to provide adequate inventory records to support
> their position. . . . Based on the response from OR&R,
> it appears that the method for identifying imported
> merchandise for drawback employed by [Toyota] is most
> likely invalid. Accordingly, all the claims filed to
> date by [Toyota] would be ineligible for payment since
> they would have been based on a flawed methodology.
> Therefore, we are proposing to deny the drawback and
> rebill the accelerated payments for all the [Toyota]
> claims currently on file with this office.

August 30 Letter. Customs also provided Toyota with a copy of HQ

228671, which was a communication from Customs Headquarters

ruling on the request for internal advice, dated July 24, 2001

(the "Internal Advice Ruling"). Plaintiff was granted time to

submit additional information to Customs in response to the

Internal Advice Ruling and the August 30 Letter. Pl.'s Rule 56.1

Statement ¶¶16-17; Def.'s Resp. to Pl.'s Rule 56.1 Statement

¶¶16-17.

On October 26, 2001, Toyota submitted a response to the

August 30 letter and the Internal Advice Ruling, in which the

company provided additional information to Customs in support of

its "days of supply" calculation for establishing an average

inventory turnover period. In addition, a meeting between Toyota

and Customs' Drawback Office personnel was held on November 20,

2001 to further discuss Toyota's drawback claims. During this

meeting, Customs informed Toyota that, after reviewing the
additional information submitted, Toyota's "days of supply"
method still did not appear to comply with Customs' regulations
because it treated non-fungible service parts as one inventory in
calculating the average inventory turnover period.  Pl.'s Rule
56.1 Statement ¶¶18-19; Def.'s Resp. to Pl.'s Rule 56.1 Statement
¶¶18-19.  It is important to note that, before the court, Toyota
does not dispute that the "days of supply" method did not comply
with the requirements for establishing an average inventory
turnover period under § 191.14(c)(3)(iii)(C).  *See* Tr. of Oral
Argument, dated April 6, 2011 ("Oral Arg. Tr.") 12:5-13:8.

     On November 29, 2001, Customs issued a letter revoking
Toyota's drawback privileges on the grounds that the company's
Inventory Turnover Method claims, using the "days of supply"
approach, were noncompliant with § 191.14(c)(3)(iii)(c).  Pl.'s
Rule 56.1 Statement ¶20; Def.'s Resp. to Pl.'s Rule 56.1
Statement ¶20.  On December 21, 2001, Plaintiff appealed this
decision to Customs' Office of Field Operations, Office of Trade
Programs.  On June 7, 2002, the Office of Trade Programs denied
the appeal, agreeing that Toyota's inventory turnover calculation
did not comply with § 191.14(c)(3)(iii)(c) because it considered
several different kinds of service parts as part of a single
inventory.  On June 18 and 27, 2002, Toyota wrote the Office of
Trade Programs to express its disagreement with this decision.

Pl.'s Rule 56.1 Statement ¶¶21-23; Def.'s Resp. to Pl.'s Rule

56.1 Statement ¶¶21-23.

Toyota then asked that it be permitted to perfect[14] its

drawback claim by using a different inventory accounting method

provided for in § 191.14(c), *i.e.*, the Blanket Method that it had

historically employed.  Pl.'s Rule 56.1 Statement ¶¶21-23; Def.'s

Resp. to Pl.'s Rule 56.1 Statement ¶¶21-23.

On July 29, 2002, the Office of Trade Programs informed

Toyota that it would treat its request to perfect as a request to

amend its drawback claim.[15]  Accordingly, the Office of Trade

---

[14]     Perfection refers to the submission of additional
information in support of an otherwise completed drawback claim,
usually at the request of Customs.  Thus, a party's submission of
additional information to Customs is a "perfection" when it
supplements a completed drawback claim.  An "amendment" is made
when information is submitted that is in addition to the
information and materials required for a completed drawback claim
under 19 C.F.R. § 191.51(a).  Pursuant to § 191.52(b), a drawback
claimant may perfect its claims "more than 3 years after the date
of exportation or destruction of the articles which are the
subject of the claim."

[15]     Amendment, as distinct from perfection, occurs when a
party seeks to make changes to information or submissions that
are required in 19 C.F.R. § 191.51(a) as part of a completed
drawback claim.  "[A]ll documents necessary to complete a
drawback claim, including those issued by the Customs Service,
shall be filed or applied for, as applicable, within 3 years
after the date of exportation or destruction of the articles on
which drawback is claimed . . . .  Claims not completed within
the 3-year period shall be considered abandoned. No extension
will be granted unless it is established that the Customs Service
was responsible for the untimely filing."  19 U.S.C. §
1313(r)(1); *see also* 19 C.F.R. § 191.52(c) ("Amendments to claims
for which the drawback entries have not been liquidated must be
made within three (3) years after the date of exportation or
destruction of the articles which are the subject of the original

Programs determined that the request was barred by the three-year

time limit for amending drawback claims pursuant to 19 C.F.R.

§ 191.52(c).  Pl.'s Rule 56.1 Statement ¶24; Def.'s Resp. to

Pl.'s Rule 56.1 Statement ¶24.  On October 11 and 25, 2002,

Customs denied Toyota's drawback claims, and sought repayment of

amounts previously paid pursuant to the accelerated payment

mechanism.  Pl.'s Rule 56.1 Statement ¶25; Def.'s Resp. to Pl.'s

Rule 56.1 Statement ¶25.  On January 8, 2003, Toyota timely filed

its Protest and an application for further review[16] challenging

Customs denial of its drawback claims.  Pl.'s Rule 56.1 Statement

¶26; Def.'s Resp. to Pl.'s Rule 56.1 Statement ¶26.


V. Custom's Protest Ruling

     On June 3, 2004, Customs issued Headquarters Ruling 229938

(the "Protest Ruling") in response to Toyota's Protest and

request for further review.  The Protest Ruling addressed, what

───────────────────

drawback claim.").

     [16]     Pursuant to 19 C.F.R. § 174.23, a protestant may
accompany a protest with an application for further review.  If,
upon review, the port director at the port of entry determines
that the protest will be granted, no further review is deemed
necessary.  If, however, the port director determines that the
protest should be denied, in whole or in part, further review of
the protest is undertaken by Customs' Headquarters, rather than
the applicable port director, so long as one of the criteria for
further review, set forth in 19 C.F.R. § 174.24, are met.  See 19
C.F.R. § 174.26. Customs Headquarters then instructs the port
director as to the disposition of the protest.  19 C.F.R. §
174.27.

it identified as, three separate issues raised by the Protest:

(1) "whether [Toyota's] calculation of the [Inventory Turnover

Method] to the 42 subject entries [was] consistent with 19 CFR

191.14(c)(3)(iii)(c)"; (2) "whether [Toyota] [could] perfect the

42 subject entries to apply the low-to-high blanket method in

accordance with 19 CFR 191.52(b)"; and (3) "whether [Toyota's]

application of the low-to-high blanket method [was] consistent

with 19 CFR 191.14(c)(3)(iv)(A)."  Protest Ruling at 3, attached

as Ex. 2 to Pl.'s Mot. S.J.

     With respect to issue (1), Customs denied the Protest,

finding that Toyota's Inventory Turnover Method did not comply

with Customs' regulations because, in using the forty-eight day

inventory turnover period based on its "days of supply"

calculation, Toyota "applied an average turn-over period for all

service parts rather than an average turn-over for each distinct

part."  Protest Ruling at 5.  In so finding, Customs rejected

Toyota's argument that all of its service parts constituted "the

same kind of merchandise."  Customs explained its determination

as follows:

> The establishment of the average inventory turn-over
> period "is based on the rate of withdrawal from
> inventory and represents the time in which all of the
> merchandise in the inventory at a given time must have
> been withdrawn."  19 CFR 191.14(c)(iii)(c).  This is
> based on a single inventory where the goods have been
> identified.  However, this same provision also provides
> an option for an inventory of more than one kind of
> good.  The "except" clause in 19 CFR 191.14(c)(iii)(c)
> provides for this option which states that ' . . . if

> the person using the method has more than one kind of
> merchandise or articles with different inventory turn-
> over periods, the longest average turn-over period
> established under this section may be used . . . ."
> Therefore, instead of having different inventory
> periods for each good, the regulation permits the
> person to use the longest average turn-over period.
> However, [Toyota] did not apply the longest average
> turn-over period but chose to establish an average
> inventory period based on its entire inventory of
> service parts, treating them as one kind of
> merchandise.
>
>                          . . . .
>
> [A]pplication of an inventory management method to
> identify a particular good requires that the goods to
> be identified be fungible.  The evidence of the
> different names, different part numbers and different
> prices convey that the parts covered by the term
> "service parts" are not interchangeable or identical in
> all situations.  Consequently, the port's denial of
> [Toyota's] use of an average inventory turn-over period
> that would treat the category of service parts as one
> inventory was proper.

Protest at 4-5.  In other words, Customs determined that Toyota's

treatment of all of its various service parts (*e.g.*, brake hoses,

door bezel, shift lock stopper) as part of the same inventory,

rather than treating each type of service part separately,

violated the regulation because only fungible goods, *i.e.*, parts

of the same type, could be treated as part of a single inventory.

As to issue (2), Customs reversed the decision of the Office

of Trade Programs, and found that changing inventory methods

would constitute a perfection, rather than an amendment to

Toyota's drawback claim.  Thus, Toyota was permitted to "perfect"

its drawback claims by substituting the Blanket Method for the

Inventory Turnover Method.  In reaching this decision, Customs

found that, because Toyota's use of a different inventory

accounting method would be applied to the same documentation it

had originally submitted, it would perfect the drawback claims

under 19 C.F.R. § 191.52(b):

> [d]emonstrating the identity of a particular imported
> good as being the good exported by a different
> inventory management method than by the method
> originally used, perfects, rather than amends a claim.
> That is, the new inventory management method is applied
> to identify the same good[s] in the claim as originally
> filed without any change of the import entries and
> export shipments.  Perfection generally consists of the
> submission of additional information for what is
> already a complete claim.

Protest Ruling at 5.  Put another way, Toyota could change from

using the Inventory Turnover Method to using the Blanket Method,

so long as its claim continued to relate to the same goods and it

did not attempt to submit new information relating to different

entries or different exported goods.  Thus, although Toyota

labeled its attempt to change accounting methods, while using the

same previously submitted documentation, as an amendment, Customs

found that Toyota was actually seeking to perfect its claims.

Having determined that the Office of Trade Programs' refusal

to allow Toyota to substitute the Blanket Method for the

Inventory Turnover Method was erroneous, Customs considered the

merits of Toyota's claims under the Blanket Method.  In resolving

issue (3), however, Customs found that Toyota's drawback claims

under the Blanket Method did not comply with 19 C.F.R.

§ 191.14(c)(3)(iv) and, thus, Toyota's drawback claims were

denied.  This conclusion was reached based on Customs' review of

the inventory records submitted by Toyota in support of its

drawback claims.  On review, Customs found that:

> those records fail to show that [Toyota] properly
> identified the imported parts on which the claim was
> based on as having been the parts exported to Canada.
> . . . The application of the low-to-high blanket
> method using the 'Import Price History' provided by
> [Toyota] fails to demonstrate the export of the
> imported parts on which the claims was based in
> compliance with 19 U.S.C. § 1313(j)(1) and 19 U.S.C §
> 3333(a)(1).

Protest Ruling at 6-7.  Therefore, Customs found that the

inventory records submitted by Toyota in support of its Blanket

Method failed to demonstrate that the imported service parts, for

which it sought drawback, were actually exported to Canada within

the three year time period required for NAFTA Drawbacks.  Thus,

although Toyota was permitted to "perfect" its drawback claims

pursuant to 19 C.F.R. § 191.52(b) by substituting the Blanket

Method for the Inventory Turnover Method, the company's claims

were ultimately denied because they did not comply with the

substantive requirements of §§ 3333(a) and 1313(j).


VI.  The Parties' Cross-Motions

Toyota does not dispute any of the three findings made by

Customs in the Protest Ruling.  Rather, plaintiff claims that it

should have been permitted to perfect its drawback claims under

the Inventory Turnover Method using a three-year inventory turnover period. Compl. ¶¶38-52. According to Toyota, this argument was raised in its Protest, but was not addressed by Customs in the Protest Ruling. Pl.'s Mem. 13 (citations omitted).

In the alternative, Toyota insists that it should be permitted to amend its drawback claims to submit new documentation in support of its use of the Blanket Method. According to Toyota, this untimely amendment should be permitted pursuant to 19 C.F.R. § 191.51(e)(1), which allows out-of-time amendments to drawback claims when Customs is responsible for the delay in submitting an amended claim. Compl. ¶¶53-60. This precise issue was not raised by Toyota in the Protest.[17]

Defendant responds that Toyota's first claim fails because the governing statutes and regulations do not permit the use of a three year turnover period under the facts of this case. In addition, Defendant insists that Toyota's second claim fails as a matter of law because there is no evidence in the record to

_____

[17] In the Protest, Toyota asserted that it was permitted to untimely amend its drawback claims by substituting the Blanket Method for the Inventory Turnover Method because Customs was responsible for Toyota's failure to amend within the time required by 19 U.S.C. § 1313(r) and 19 C.F.R. §§ 191.51 and 191.52. As noted, in the Protest Ruling Customs reversed its prior decision, and found that Toyota was permitted to substitute the Blanket Method because the substitution was a perfection, not an amendment and, therefore, not subject to the time limitations for amending drawback claims.

support a finding that Customs was responsible for Toyota's

untimely amendment to its drawback claims.

The parties have cross-moved for summary judgment.  Oral

argument was held on April 6, 2011.  *See generally* Oral Arg. Tr.


### STANDARD OF REVIEW

The court reviews Customs' denial of a protest *de novo*.  28

U.S.C. § 2640(a)(1).  "Under *de novo* review, the court does not

examine the reasonableness of Customs' conduct but instead

presumes that the factual determinations made by Customs are

correct."  See *Jazz Photo Corp. v. United States*, 502 F. Supp. 2d

1277, 1293, 31 C.I.T. 1101, 1118 (2007); 28 U.S.C. § 2639(a)(1).

This presumption of correctness, however, does not apply to

Customs' legal determinations, which the court reevaluates anew.[18]

*Universal Elecs. v. United States*, 112 F.3d 488, 492 (Fed. Cir.

1997) ("[A]s a practical matter, the presumption carries no force

as to questions of law."); *Rollerblade, Inc. v. United States*,

112 F.3d 481, 483-84 (Fed. Cir. 1997) ("[T]he statutory

presumption of correctness under § 2639 is irrelevant where there

is no factual dispute between the parties.").

"Summary judgment is appropriate if 'there is no genuine

---

[18]     It appears that Toyota's new arguments before the Court
would constitute merely "new grounds" because they concern the
same entries and the same administrative decision, and are,
therefore, permissible under 28 U.S.C. § 2638.

issue as to any material fact,' and 'the movant is entitled to

judgment as a matter of law.'" *Citizen Watch Co. of Am., Inc. v.*

*United States*, 34 CIT __, __, 724 F. Supp. 2d 1316, 1319 (2010)

(quoting USCIT R. 56(c)).  Here, there is no dispute between the

parties as to any material fact and, thus, summary judgment is

appropriate.


                              DISCUSSION

I.  Perfection of Drawback Claims Using a Three Year Average
Inventory Turnover Period

        Toyota's first claim, for which it seeks summary judgment,

is that it should be permitted to perfect its drawback claims

under the Inventory Turnover Method by using a three year average

inventory turnover period.  As noted, Toyota used a forty-eight

day turnover period in its drawback claims, based on its "days of

supply" calculation.  Because Customs found that the calculation

of this period did not comply with § 191.14(c), Toyota now seeks

to perfect its claim by using a different inventory turnover

period.  As authority for its use of this three year period,

Toyota relies on the following language in 19 C.F.R.

§ 191.14(c)(3)(iii)(C):

        The inventory turn-over period must be that for the
        merchandise or articles to be identified, *except that*
        *if the person using the method has more than one kind*
        *of merchandise or articles with different inventory*
        *turn-over periods, the longest average turnover period*
        *established under this section may be used* (instead of
        using a different inventory turn-over period for each

kind of merchandise or article).

(emphasis added).  Toyota argues that this provision allows it to
use a three-year inventory turn-over period because its inventory
of one part, a starter switch repair kit, did not turnover for
more than three years.  According to Toyota:

> In the case of Plaintiff's service parts inventory,
> the sheer diversity of merchandise did not permit
> Plaintiff to practically track inventory turn-over on
> a part-specific basis.  As a result, establishing
> inventory turn-over based on the "longest average
> turn-over period" for such merchandise presented the
> only viable option available to Plaintiff.  At the
> same time, the duration of that time period is
> effectively constrained by the overarching limitation
> of the drawback statute which requires unused
> merchandise drawback claims to be made within three
> (3) years of the date of importation.

Pl.'s Mem. 12.  Hence, Toyota maintains that it can use a three
year turnover period because it may use the longest single
inventory turnover period for any one service part as the average
inventory turnover period for all parts when using the Inventory
Turnover Method.  In addition, Toyota insists that, if the
inventory turnover period for the one part is longer than three
years, using a three year inventory turnover period in applying
the Inventory Turnover Method is the only way to "foster harmony"
between § 191.14(c)(3)(iii)(c) and § 1313(j)(1)(A).

Specifically, Toyota asserts:

> 19 C.F.R. § 191.14(c)(3)(iii)(c) establishes that "the
> longest average turn-over period" may be used when
> claimant has more than one kind of merchandise or
> articles with different inventory turn-over periods.
> At the same time, 19 C.F.R. § 191.31(b) implements the

> provisions of 19 U.S.C. § 1313(j)(1)(A) requiring
> merchandise encompassed within an unused merchandise
> drawback claim to be exported within three (3) years
> of its original importation ("three year import to
> export"). At their heart, these two regulatory
> provisions present the opportunity for conflict when -
> as in the case of Plaintiff's service parts inventory
> - a part found within an unused merchandise drawback
> claim retains an inventory turn-over period longer
> than the "three year import to export" time horizon
> established under Section 191.31(b).
>
> To foster regulatory harmony, therefore, the
> only means by which these two ostensibly conflicting
> provisions may be reconciled is to permit the "three
> year import to export" time horizon mandated under 19
> U.S.C. § 1313(j)(1)(A) and 19 C.F.R. § 191.31(b) to
> dictate the "longest inventory turn-over period"
> applicable under 19 C.F.R. § 191.14(c)(3)(iii)(C).

Pl.'s Mem. 14. Thus, for plaintiff, if it can demonstrate that

the inventory turnover period of a particular service part was in

excess of three years then, "to foster regulatory harmony," it

may use three years as the inventory turnover period for purposes

of the Inventory Turnover Method.

Defendant responds that Toyota's proposed three year

inventory turnover period does not comply with the statutory and

regulatory provisions governing NAFTA Drawback. Defendant

recognizes that "the origin of the goods as imported dutiable

merchandise could be determined through inventory methods

authorized by regulations." Def.'s Mem. 18 n.8. But, according

to defendant, "Toyota relied on the inventory methods authorized

by the Customs regulations, but did not comply with the mandatory

terms of those regulations." Def.'s Mem. 18. Defendant's

primary argument is that Toyota has not established that the

exports for which it seeks drawback were actually (1) dutiable,

*i.e.*, a duty was paid upon import, and (2) exported within three

years of import, as required for NAFTA Drawbacks.

The court agrees that Toyota's use of a three year inventory

turnover period based on one part remaining in inventory for

longer than three years is inconsistent with the statutory and

regulatory requirements for NAFTA Drawbacks. "Drawbacks are a

privilege, not a right." *Hartog Foods Int'l, Inc. v. United

States*, 291 F.3d 789, 793 (Fed. Cir. 2002) (citing *United States

v. Allen*, 163 U.S. 499, 504 (1896)). As a "statutory privilege,"

drawback is "due only when enumerated conditions are met."

*GUESS?, Inc. v. United States*, 944 F.2d 855, 858 (Fed. Cir.

1991). In this case, entitlement to drawback benefits are

expressly conditioned, by statute, on compliance with § 191.14.

*See* 19 U.S.C. § 3333(a)(2)(B) ("[I]f a good described in the

first sentence of this paragraph is commingled with fungible

goods and exported in the same condition, the origin of the good

may be determined on the basis of the inventory methods provided

for in the regulations implementing this title."); *Id.* § 1313(l)

("Allowance of the privileges provided for in this section shall

be subject to compliance with such rules and regulations as

[Customs] shall prescribe . . . ."); *Graham Eng'g Corp. v. United

States*, 510 F.3d 1385, 1389 (Fed. Cir. 2007) ("The rulemaking

authority vested in the agency by subsection (l) explicitly

conditions allowance of the benefits of section 1313 on

compliance with regulations Customs has prescribed.").

Accordingly, Toyota is entitled to duty drawback only to the

extent that it complies with the applicable regulatory

requirements.

Toyota's proposed use of a three year inventory turnover

period is inconsistent with at least two requirements of

§ 191.14.  First, the Inventory Turnover Method requires that a

drawback claimant establish an <u>average</u> inventory turnover period

for each specific type of merchandise or article for which it

seeks duty drawback.  Even where, as here, a claimant has several

kinds of merchandise, and seeks to use the longest average

inventory turnover period of any one product to identify the

drawback eligible units of several different products, an average

turnover period still must be calculated for each part in order

to determine which is the longest.  To establish this average

inventory turnover period, § 191.14(c)(3)(iii)(C) requires that

"at least 1 year, or three (3) turn-over periods (if inventory

turns over less than 3 times per year), *must be averaged.*"

(Emphasis added).

Toyota's proposed average inventory turnover period,

however, is not an average at all.[19]  Rather, it is simply an

assigned period based on its contention that 448 of its starter

switch repair kits remained in inventory for more than the three

year period for submitting drawback claims under § 1313(j).

Thus, rather than averaging several turnover periods for its

starter switch repair kits, Toyota merely observed that one

turnover period was longer than three years.  Accordingly,

Toyota's proposed inventory turnover period is inconsistent with

§ 191.14(c)(3)(iii)(C).

     Toyota's reliance on the exception for inventories

consisting of "several kinds of merchandise" also misses the

point.  Section 191.14(c)(3)(iii)(C) would permit the use of the

longest average inventory turn-over period, calculated on a part-

specific basis, to be applied separately to its inventory of each

kind of service part.  In order to take advantage of this

exception, however, Toyota must first calculate the longest

---

     [19]   In other words, Toyota did not take an average of the
length of time it took for its inventory of starter kits, or any
other service part, to be depleted.  Rather, Toyota sought to use
the period of time that it took its inventory of 57,900 starter
kits to turnover.  The purpose of requiring an average turnover
period appears to be to prevent a drawback claimant from taking
an aberrational or atypical turnover period, that might lead to
greater drawback than a claimant is entitled to, and using this
turnover period to identify drawback eligible merchandise under
the Inventory Turnover Method.  Here, the average inventory
turnover period might well have been less than three years for
starter switch repair kits.  However, there is no way to
determine this because of Toyota's failure to calculate an
average.

average inventory turnover period for a particular part, and,

second, apply this established inventory turnover period

separately to each of its part-specific inventories.  That is,

had Toyota established an average inventory turn-over period for

starter switch repair kits, and if that period were the longest

average inventory turnover period for any of the company's

service parts, then Toyota could have applied this period to

front brake hoses, door bezels, shift lock stoppers, and other

service parts.  Thus, using this method, once the longest average

inventory turnover period for any one service part was

determined, Toyota could use that period as the inventory

turnover period in applying the Inventory Turnover Method on a

part-specific basis to identify the drawback eligible units of

each kind of service part.

Toyota has failed to meet these regulatory requirements.  As

noted above, Toyota has not calculated the longest average

inventory turnover period for any specific service part.

Consequently, the company has not identified the longest average

inventory turnover period for any particular service part, and,

having failed to do so, it cannot apply this period to its other

service parts.  Accordingly, Toyota's claim that it should be

permitted to perfect its claim by applying the Inventory Turnover

Method using a three year inventory turnover period is

inconsistent with the averaging requirements of

§ 191.14(c)(3)(iii)(C), and with the requirement to calculate a
turnover period for each type of part in order to determine which
is the longest.

In addition, in using any variation of the low-to-high
inventory accounting method to identify drawback eligible
merchandise "if the merchandise or articles identified were
attributable to an import more than . . . 3 years . . . before
the claimed export, no drawback could be granted." 19 C.F.R.
§ 191.14(c)(3)(i).  Consequently, drawback eligible merchandise
may only be identified through inventory accounting when the
chosen accounting method will definitively demonstrate that
dutiable imports were actually withdrawn from inventory for
exportation within the three year time limit for drawbacks set
forth in 19 U.S.C. § 1313(j).

Toyota's proposed methodology would not demonstrate that its
merchandise was exported within three years of importation.
Using a three year turnover period based on the idea that the
turnover period for a particular part was longer than three years
could result in Toyota receiving drawback for merchandise
actually imported more than three years prior to exportation.
Therefore, the three-year inventory turn-over period proposed by
Toyota would not "represent[] the time in which all of the
merchandise or articles in the inventory at a given time must
have been withdrawn."  19 C.F.R. § 191.14(c)(3)(iii)(C).  Because

Toyota's proposed inventory turnover period does not represent
the length of time it takes for its inventory to actually
turnover, using its proposed method would not establish the time
in which all of the merchandise in a given inventory was imported
and subsequently withdrawn for export.  19 C.F.R.
§ 191.14(c)(3)(iii)(C).  Accordingly, since at least one of the
service parts for which its seeks drawback was in inventory for
nearly five years, under Toyota's proposed inventory turn-over
period calculation, there is a strong likelihood that it would
receive duty drawbacks for goods that were imported more than
three years prior to export, in contravention of § 1313(j)(1)(A).

     Thus, Toyota's attempt to perfect its drawback claim using
the inventory Turnover Method fails because its proposed three
year inventory turnover period does not comply with the
requirements of § 191.14.


II.  Untimely Amendment of Drawback Claims Using the Blanket
Method

     Toyota argues that, if it is not permitted to perfect its
drawback claims under the Inventory Turnover Method, it should be
allowed to amend its drawback claims and submit new documentation
in support of its claims under the Blanket Method.  Toyota
concedes that the time for amending its drawback claims has
expired.  See Pl.'s Mem. 15 ("Plaintiff should be permitted to
untimely amend its drawback claims . . . .").  Nevertheless, the

company insists that it should be permitted to make this untimely
amendment pursuant to 19 C.F.R. § 191.51(e)(2), because Customs
was responsible for its failure to timely amend its drawback
claims.  According to Toyota, "Plaintiff's inability to timely
substitute the [Blanket Method] for the [Inventory Turnover
Method] is proximately caused by [Custom's] failure to
efficiently evaluate and administer Plaintiff's drawback claims."
Pl.'s Mem. 16.

     At bottom, Toyota argues that Customs was responsible for
its failure to file new paperwork to further back up its drawback
claims using the Blanket Method[20] by inducing Toyota to believe
that its original Inventory Turnover Method claims would be
allowed because "numerous exchanges between Plaintiff and
[Customs], . . . resulted in Plaintiff's understanding (either
through direct statements or otherwise) that its drawback claims
were 'probably okay.'"  Pl.'s Mem. 21.  According to Toyota,
Customs delay in processing and ruling on Toyota's claims meant
that, by the time Toyota's claims were formally denied, the
three-year window for amending its claims had closed.  Therefore,
Toyota maintains that Customs led it to believe that its drawback
claims were proper as originally filed, which caused it to forego

---

[20]     As set forth *supra*, Customs did permit Toyota to
perfect its claims by substituting the Blanket Method but found
that the perfection failed to demonstrate that the merchandise
was actually exported to Canada.  Further, as noted, Toyota does
not dispute this determination.

any opportunity to amend its claims to correct any deficiencies,
and then delayed in ruling on Toyota's claim, which prevented it
from amending its claims within the time frame afforded under
§ 191.52(c).

Pursuant to 19 U.S.C. § 1313(r) and 19 C.F.R. § 191.51(a), a
completed drawback claim must be filed within three years from
the date of exportation of the merchandise for which drawback is
sought.  A "complete drawback claim" generally must include the
"drawback entry on Customs Form 7551, applicable certificate(s)
of manufacture and delivery, applicable Notice(s) of Intent to
Export, Destroy, or Return Merchandise for Purposes of Drawback,
applicable import entry number(s), coding sheet unless the data
is filed electronically, and evidence of exportation or
destruction under subpart G of this part."  19 C.F.R. §
191.51(a); *see also Delphi Petroleum, Inc. v. United States*, 33
CIT __, __, 662 F. Supp. 2d 1348, 1351-52 (2009).  In addition, a
drawback claim must also include a correct calculation of the
amount of reimbursement sought. *See Aectra Ref. & Mktg., Inc. v.
United States*, 565 F.3d 1364, 1371 (Fed. Cir. 2009).  A party may
amend an unliquidated drawback claim at anytime within three
years of the exportation of the merchandise for which drawback is
sought. *See* 19 C.F.R. § 191.52(c).  No amendment is permitted,
however, for drawback claims after the expiration of this three
year period "unless it is established that Customs was

responsible for the untimely filing." 19 U.S.C. § 1313(r); 19

C.F.R.              § 191.51(e). Accordingly, the dispositive

issue is whether Customs was responsible for Toyota's failure to

timely amend its claims.[21]

    Customs has not promulgated any regulation defining what it

means for "Customs to be responsible for the late filing," as set

forth in § 191.51(e)(2). In addition, Customs has not had the

opportunity to determine whether it is responsible for Toyota's

untimely amendment, as this precise issue was not raised in

Toyota's Protest.[22] Nevertheless, the court "shall make

determinations upon the basis of the record made before the court

---

[21]    It should be noted that Toyota has not placed before
the court the documents it seeks to submit to Customs and so has
provided no evidence that its amended claims would be compliant
with the applicable statutes and regulations or, indeed, that
they would be an amendment to its drawback claims. In this
connection, the court will rely on plaintiff's representation
that the documents would constitute an amendment.

[22]    The court, nevertheless, has jurisdiction over Toyota's
claim because it merely constitutes "new grounds" on which it
challenges Customs' decision to deny its drawback claims. Under
28 U.S.C. § 2638, "[i]n any civil action . . . in which the
denial, in whole or in part, of a protest is a precondition to
the commencement of a civil action in the Court of International
Trade, the court, by rule, may consider any new ground in support
of the civil action if such new ground- (1) applies to the same
merchandise that was the subject of the protest; and (2) is
related to the same administrative decision listed in [19 USC §
1514] that was contested in the protest." In this case, Toyota's
second claim meets this criteria, as it seeks drawback for the
same merchandise that was subject to its protest, which
challenged the same administrative decision-the refusal to grant
drawback under 19 U.S.C. § 1514(a)(6). *See Hanover Ins. Co. v.
United States*, 25 C.I.T. 447, 451-51 (2001) (not reported in
Federal Supplement).

. . . ."  28 U.S.C. § 2640(a).

    The court holds that plaintiff has failed to produce
sufficient evidence for it to find that Customs was responsible
for Toyota's failure to file proper drawback claims in the first
instance, or its failure to timely amend its drawback claims.
That is, viewing the facts in the light most favorable to Toyota,
the evidence is insufficient for the court to find that Toyota
was induced by Customs to believe that its drawback claims would
be allowed.  *See Aegis Sec. Ins. Co. v. Fleming*, 33 CIT __, __,
593 F. Supp. 2d 1346, 1349-50 (2009).  Rather, the evidence
demonstrates that Customs notified Toyota early on in the process
that it had doubts as to whether Toyota's drawback claims
complied with the governing regulations.  Def.'s Rule 56.1
Statement ¶5 ("During the period after plaintiff's August 27,
1999 letter to Customs and before plaintiff's October 15, 1999
memorandum to Customs . . . [the agency] told Toyota that they
were not sure if Toyota's 'accounting method was completely in
accordance with the regulations.'"); Pl.'s Resp. to Def.'s Rule
56.1 Statement ¶5.  Beck Dep. 19:14-20:14 ("Q. Did you contact
[Toyota] at this time for additional information?  A.  We did
contact them to get additional information.  Q.  At that time did
you tell them the reason why that information was necessary?  A.
Yes.  Q.  And what was the reason that you told them?  A.  We
were not sure if their accounting method was completely in

accordance with the regulations."). Moreover, Toyota, as a
sophisticated party with its own drawback specialists, was aware
of its obligations as a drawback claimant. *See* Def.'s Rule 56.1
Statement ¶¶35-42; Pl.'s Resp. to Def.'s Rule 56.1 Statement
¶¶35-42; Dep. M. Duntley (July 22, 2009) 48:9-12 ("Q. Were
importers required to be fully knowledgeable of the regulations .
. . if they sought to make claims for [drawback]? A.  Yes, they
were.").

     When Customs granted Toyota's application for a waiver of
notice in June 1999, it expressly advised the company that the
granting of those privileges was not to be taken as an indication
of Customs' acceptance of Toyota's proposed Inventory Turnover
Method calculation.  Def.'s Rule 56.1 Statement ¶2 ("In approving
this request, the U.S. Customs Service expresses no opinion as to
the entitlement of drawback and makes no assurances, rulings, or
decisions that may be relied upon to anyone's detriment."); Pl.'s
Resp. to Def.'s Rule 56.1 Statement ¶2.  Shortly after Toyota's
filing of its original drawback claims under the Inventory
Turnover Method, Customs informed Toyota that it had doubts as to
the validity of Toyota's inventory turnover period calculations.
Beck Dep. 19:14-20:14; Def.'s Rule 56.1 Statement ¶5 ("During the
period after plaintiff's August 27, 1999 letter to Customs and
before plaintiff's October 15, 1999 memorandum to Customs . . .
[the agency] told Toyota that they were not sure if Toyota's

'accounting method was completely in accordance with the

regulations.").  Toyota was aware of these concerns, and, on

several occasions, submitted additional information to Customs in

an effort to support its proposed inventory turnover period

calculation.  Pl.'s Rule 56.1 Statement ¶¶13-14; Def.'s Resp. to

Pl.'s Rule 56.1 Statement ¶¶13-14.

By July 25, 2000, at the latest, Customs had informed Toyota

that it had sought internal advice regarding whether Toyota's use

of the Inventory Turnover Method complied with applicable

regulations, and admonished Toyota that an adverse ruling could

result in the rejection of Toyota's drawback claims.  July 25,

2000 Letter ("[W]e would like to caution you that an adverse

ruling by our Headquarters could affect Toyota's drawback

eligibility for your claims currently on file.").  At that time,

Customs also informed Toyota that it might be some time before a

ruling was issued from Customs Headquarters on the request for

internal advice.  *Id.*  Under these facts, Toyota's knowledgeable

staff should have recognized that, *at a minimum*, there was a

possibility that its drawback claims would not be approved.  At

that point, Toyota still had time to amend its drawback claims

covering merchandise that was exported after July 25, 1997.  *See*

19 C.F.R. § 191.52(c) ("Amendments to claims for which the

drawback entries have not been liquidated must be made within

three (3) years after the date of exportation or destruction of

the articles which are the subject of the original drawback
claim.").

Importantly, up to that point, Customs had not given any
indication as to the sufficiency of Toyota's claims, other than,
according to Toyota, its failure to indicate that they were
deficient, and the vague oral comment that the claims were
"probably okay."  Duntley Decl. at ¶12.  Knowing that Customs had
expressed doubt as to the validity of its Inventory Turnover
Method claims, and the deadlines for amending those claims,
Toyota could have reviewed its claims internally and determined
whether to continue to pursue them as filed.

Despite having experienced personnel submitting drawback
claims on its behalf, however, Toyota continued to pursue claims
using the Inventory Turnover Method, rather than seeking an
alternative course after being apprised of Customs' ambivalence
as to the validity of its claims.

Toyota argues that it was unable to effectively evaluate its
own claims because Customs failed to adequately inform the trade
community as to the requirements for calculating an inventory
turnover period.  The regulation is clear, however, that the
inventory turnover period must be calculated for an inventory of
fungible goods.  *See* 19 C.F.R. § 191.14(b)(1) ("The lots of
merchandise or articles to be so identified must be fungible").
The meaning of "fungible" in this context is clearly set forth in

19 C.F.R. § 191.2(o).  No additional explanation was necessary.
As the Protest Ruling demonstrates, Toyota's calculation was
noncompliant because, inter alia, it failed to meet the
fungibility requirement set forth in § 191.14(b) because it used
several kinds of service parts (e.g., hoses, gaskets, valves,
belts) - parts that were not commercially interchangeable - to
calculate an average inventory turnover period.  Toyota should
have known that these service parts were not fungible.
Accordingly, Toyota should have known that calculating an
inventory turnover period based on the turnover of all of its
service parts did not comply with the fungibility requirement.
Indeed, Toyota now concedes that its original "days of supply"
inventory turnover period calculation was at odds with the
requirements of § 191.14(b).  See Oral Arg. Tr. 12:3-13:17.
Nevertheless, the company did not seek to correct its claims (by
amendment or perfection) until after November 2001, when Customs
determined that its claims were noncompliant.

     Based on the undisputed facts, it is clear that Toyota
voluntarily chose to abandon the Blanket Method and pursue the
Inventory Turnover Method, and that Customs did not cause it to
believe that its claims complied with the applicable regulations,
or induce Toyota to forego amending its claims to substitute the
Blanket Method for the Inventory Turnover Method until after the
expiration of the three year period for amending drawback claims.

Indeed, Customs cautioned Toyota that its new methodology might not be allowed.  In this respect this case is dramatically different from *Delphi Petroleum*, where the Court found that untimely drawback claims for certain harbor tariffs were the responsibility of Customs when a Customs officer directed the drawback claimant to wait until it filed its protest to assert these claims for the first time.

Indeed, *Delphi Petroleum* stands for the proposition that Customs' delay in ruling on Toyota's claims does not, by itself, render Customs responsible for plaintiff's filing of claims that did not comport with the applicable law.  *See Delphi*, 33 CIT at __, 662 F. Supp. 2d at 1354 (finding that Customs' "delay in liquidating claims," without more, did not render Customs responsible for delay in amending drawback claims).

Having determined that Customs did not induce Toyota to believe that its Inventory Turnover Method claims would be allowed, the court finds no merit to Toyota's claim that Customs' delay in ruling on Toyota's drawback claims render it responsible for Toyota's failure to seek the timely amendment of those claims.

## CONCLUSION

For the foregoing reasons, the court finds that there are no genuine issues as to any material facts and all of Toyota's claims lack merit as a matter of law.  Therefore, plaintiff's

Court No. 04-00643                                          Page 43

motion for summary judgment is DENIED and defendant's motion for

summary judgment is GRANTED.  Accordingly, it is hereby

    ORDERED that judgment is entered in favor of defendant, and

this case is hereby dismissed.




                                         /s/ Richard K. Eaton
                                        Richard K. Eaton

Dated:      September 8, 2011
             New York, New York